Thank you. Good morning, Your Honors. My name is Ken Friedman, along with Henry Jones. We represent Richard Koch in this matter. Koch. Koch. Oh. I'm okay. It's in the record. I know. This, unlike other cases, falls at the end of your calendar, and it does involve complicated issues of law and fact, and I'm not going to be able to hit all of them in even 15 minutes, but I think both sides really packed a lot into their briefs. Yeah, we've got a lot of briefs, and we've read them all. Yes, and there's a lot packed in there. But as an overview, this case involves an attempt by Northwestern Mutual Life to do one of the hardest things to accomplish in our civil justice system, which is to rescind a disability policy that's been in place over two years when the insured has an uncontested disability as the result of alleged misstatements in his applications in light of the fact that these policies have what's called an incontestability clause, which is required by Washington law, and when fact appeared in these policies, which says that no policy of insurance can be revoked after it's been enforced for two years without clear and convincing evidence of fraud on behalf of the policyholder. What we have in this case is a good illustration of why that's good public policy, because as you will see as you review the record in this case, Northwestern Mutual put a lot of emphasis on Dr. Cook's lack of ability to put explanations as to answers he made 14 to 16 years prior to this action. It certainly is a tough position for a policyholder to be in to explain answers 14 to 16 years after the fact. This case, as you probably know, primarily involves two disability policies, one issued in 1992 and modified in 1993, and another one that was issued in 1994. The district court dismissed or actually granted summary judgment in favor of Northwestern Mutual on the earlier policy. The district court denied summary judgment on the second policy and allowed it to go to verdict. The jury in that case found that the Northwestern Mutual did not have a right to rescind the policy and was in fact affirmatively found to be in breach of the contract. The court distinguished the two policies on one ground alone, a personal history interview that was taken from Dr. Cook over the phone during the application process of the first policy. The district court went through all the application questions on the first policy, which was similar to the ones in the second policy, and found that there were material issues of fact precluding summary judgment on every one of those questions. So I'm going to spend a lot of my time this morning talking about that personal history interview. Well, before you, you're not going to have a lot of time to do that, but so could I, I have an issue that you're focusing on. I looked at the, first of all, one looks at the JMOL ruling, which essentially deals with this disparity. This is the ruling on November 17 at ER 10. There are cross motions, as I understand it. Dr. Cook had asked for, and this is the trial on the 94 policy, as I understand. That's what the district court let go to trial. That's correct. He found on the 92 policies that there was a misrepresentation, which had not been explained away by Dr. Cook. So I'm looking at the ER 10, and it says the court is prepared to rule on the Rule 50 motions. Dr. Cook has moved to enter judgment in his favor as a matter of law. The court finds that a reasonable jury, having heard of, this is before verdict, but after. This is like a directive verdict stage, I know. Finds that a reasonable jury, having heard all the evidence in this case, would have no legally sufficient evidentiary basis to find for Dr. Cook on the issue of whether he provided fraudulent misstatements in his application for the 94 policy. Then the next page he says, ruling on the Northwestern's motion, he says, after reciting certain evidence, he says at ER 11, these facts are sufficient to rebut the presumption of intent to deceive. The court finds that the intent to deceive is a question of fact for the jury, and that a reasonable jury, having heard all the evidence in this case, could find a legally sufficient evidentiary basis to determine that Dr. Cook did not intend to deceive Northwestern. Now, is there a typo in the transcript, or is that a flat-out what appears to be inconsistent ruling? The reason it's important, what I don't understand from the district courts, what I understand to have happened is that when it was on the summary judgment at the outset, on the 92 policies, the court found that Dr. Cook had not proffered any evidence to overcome the presumption of a fraudulent misstatement. And yet, at least one of the items that the court is citing as evidence on this JMOL ruling was, maybe two, that Cook was solicited for the disability, and number three, that these prior policies were enforced before Dr. Cook began the psychological treatment. In other words, that he had these policies that he was giving up to go to Northwestern. The district court is citing that as evidence in favor of denying Northwestern JMOL, and yet, as I read, at least the fact of the prior policies being extant and Dr. Cook going after the Northwestern policy was also before the court at the time of the summary judgment. So I'm confused about what appears, at least in the face of the JMOL on these two pages, a direct conflict in what's being said, and a question as to why your opposition wasn't adequate at the summary judgment stage. Well, I would agree with you that we would question why it wasn't adequate at the summary judgment stage. I don't think the district court was consistently applied the law or the arguments across the board. To the first question you raised, Your Honor, I don't think necessarily it's a typo. I think the judge may have not been as clear, but I think what was intended there when he was denying our motion, I think what he was doing was saying that that's the point where he ruled that we did not have a right to go to the jury on our bad faith in Insurance Fair Conduct Act, and he was finding that there was insufficient evidentiary basis on our part to bring that issue to a jury. And on the next page, he was saying there was insufficient evidence on the Northwestern's part to keep that question, the intent to deceive, from going to the jury. Well, I thought that might be the case, except he says whether he provided fraudulent misstatements or whether Northwestern acted in good faith or in bad faith. So, okay. I don't have an explanation because it does read as the court reads it. Well, I guess the other question, though, is that at this point, of course, he's looking at jury testimony. And so on the summary judgment, we don't have all that testimony. That's right. So, with respect to the 92 agreement, what was the evidence you presented in opposition to Northwestern Mutual's, I think it was a letter or affidavit, about these questions and about the status of the policy? I think we did not raise all of those, but I think we did raise the fact that the policies were enforced before he began treatment. We did not raise the patient questionnaires to other doctors that the judge relied upon. And we did raise the fact that he was solicited for these policies. I can get the, during Mr. Howard's argument, I will get the cite to that because you have our summary judgment briefing in the record. What I think to frame all the issues in this case, since there's cross appeals, all the arguments we are raising are de novo standard of appeal, errors of law that were alleged in Judge Settlemate, as opposed to discretionary rulings, which Northwestern Mutual is appealing. Well, let me ask you that. With respect to the 92 policy, are you actually appealing the denial of the motion for reconsideration? We are, I think what we're technically appealing is the grant of summary judgment. Well, I mean, it matters because it seemed to me if you aren't appealing the denial of the motion for reconsideration, in which there were some additional arguments put forward, then that's kind of off the table. Well, interesting, maybe not, because the judge granted the motion to reconsider. He didn't change his opinion, but he allowed us, he allowed reconsideration, which puts all that into the record. But that's not what you're appealing, right? Well, because he granted the motion to reconsider, I don't think we would have grounds to appeal that, but he reaffirmed his decision, and that's what we're appealing. So I believe that all the facts and argument on both sides, both stages of that argument. He denied the motion for reconsideration. You don't grant it. If he granted it, you wouldn't be here. No. He granted it in the fact that he asked both sides to brief it, and he issued another order. We don't call that granting. We call that considering. All right. Well, he considered it. He reconsidered his earlier ruling and then reaffirmed it. He called it granting in part and denying in part motion to reconsider. Whatever. Okay. What I think is an interesting fact about this case is without the personal history interview, there's really no distinction between the two policies. They ask similar questions, and there are similar defenses and similar arguments on both sides. I think probably both sides would agree that if that personal history interview is not allowed to be part of the decision in this case, then either this court must either reverse the summary judgment motion and send that back to trial, or it needs to throw out the verdict, the jury's verdict, on the second case, because the arguments are the same, and it's obviously our position that without the personal history interview, there would be no grounds for summary judgment. You have three minutes left. Do you want to save some time? I will save a minute. All right. Because I do want to talk about the personal history interview. The Washington law. Excuse me. I'm going to use some of that time because I'm curious about that. The personal history interview occurred in 1993. That's right. All right. The district court found that that was relevant to its ruling on summary judgment on the 92 policies. Was it argued at all that the personal history interview also polluted the Northwestern standpoint, the 94 policy? Absolutely. So, again, I'm troubled by why there's a factual dispute on the 94, but the court was willing to find as a matter of law there wasn't a factual dispute on the 92. I'm troubled by that as well. I don't understand how the court made that distinction on that fact. But the more overarching issue is the personal history interview was not part of the application. This policy and Washington law requires that no rescission can be had after two years unless there's a misstatement in the application. This is not part of the application. And we briefed that and we briefed the Washington law. If it's considered the application, then another provision of Washington law applies, which requires that Dr. Cook be allowed to review the written application. It has to be delivered with the actual policy. So what we have here is either it's not part of the application and can't be the basis for rescission or it is part of the application and it wasn't delivered with him and therefore can't be used as evidence. And we lay out the argument that supports that in the briefing. So with that, I will withhold the last minute and a half of my time. Thank you. All right. Thank you. Good morning, Your Honor. My name is Jim Howard. I'm here on behalf of the Appalachian Cross Appellant Northwestern Mutual. There are a lot of issues in the record, so I think we will have to depend on the briefing for some of those, but certainly directly. That's what we always tell counsel, you know. Make sure your briefs have it all because that's what we rely on. And if there are certain issues, feel free to direct me as I know you will. Briefly, if I could respond to some of the questions that the Court had just a moment ago. There was a distinction between the 1992 timeframe and the 1994 policy, and I think it's important to keep that in mind. And it's also important to keep in mind the record was different at the time of the summary judgment ruling and at trial. At the time of the summary judgment ruling, the appellant had made no argument on K. Now, that's the case that Judge Settle, during the ruling on the judgment as a matter of law, focused on the K case in different factors and evidence that appellant Dr. Cook suggested fit into the facts of that case and that that should be something that might rebut the presumption of fraud. That argument was not made at all in the opposition to Northwestern Mutual's motion for summary judgment. So the Court did not have those arguments in front of it at that time. But counsel, apart from whether the Court had a site to that case, the Court did have the factual argument or legal argument in the brief that he had those other policies, right? Your Honor, I don't actually think that there was, and I'd have to look at the brief, but I don't think there was much of any argument about other policies at the time of the motion for summary judgment. The second thing I would say... My impression was that there was at least a paragraph in the opposition brief that adverted to that, said that showed there's no deceit. There may have been a passing statement in that regard, Your Honor, but there was none. And I'd have to check. I'm being honest with the Court. I don't know the answer off the top of my head. That's okay. We can check. I'll tell you what you can do. It goes for both of you. We have a little piece of paper where you can add like a supplemental citation. So rather than taking your time now, you can take a little moment after the argument and give us the record citation on the things we've raised. Okay. And the other side will get a copy of that as well. We're happy to do that, Your Honor. Now the main factors, there was a number of them that were focused on at the ruling for judgment as a matter of law by the Court, wasn't just that there were these other policies. There was a suggestion that actually by counsel that Dr. Cook had been pursued by Northwestern Mutual. So the Court relied on that suggestion, and it was just argument that was raised by counsel. There was actually no evidence in the record of that. In fact, the evidence in the record was to the contrary, that Dr. Cook had himself reached out to Northwestern Mutual to inquire about coverage. So the Court made an error on that point when it was looking at what the factors were that it would rely on. There were several other things that the Court pointed to. Another one was that in 2007, Dr. Cook had filled out an intake form, and that intake form was for some medical treatment that Dr. Cook had received. When he filled out that form, one of the questions on that form was, what's the family mental health history? In response, Dr. Cook didn't list the mental health issues that had been in his family. The Court found that that was also additional evidence that it could consider as well to potentially rebut the K factors. Now maybe the short answer is, Your Honor, the K case just doesn't actually even apply here. The District Court was incorrect in applying K at that juncture. The K case involved an insured who'd had an ulcer, and six years prior that ulcer was fully cured at the time of the claim. Big difference here. Here, Dr. Cook had had 22 visits to the Clinic for Counseling and Psychotherapy, a dozen prescription medications, half of them for antidepressants, laboratory testing on at least five occasions, and an extensive medical record which led to unsuccessful treatment, which was causing him concern about his ability to work as a dentist because the hand tremors and other things of that nature would limit his ability, obviously, to continue in that particular occupation. After that unsuccessful course of treatment, five months later, he goes and applies for the maximum amount of coverage that he can obtain, as opposed to the K case where the insured did not try to obtain the maximum coverage. Dr. Cook tried to take out that coverage as quickly as possible, as opposed to the K case, which focused on the fact that the insured didn't immediately accept the coverage. Dr. Cook acknowledges that he obtained better coverage, this is in the record as well, in getting coverage through Northwestern Mutual. These were specific policies that allow you to still collect benefits, even if you have a disability in your own occupation, but can still work. So they were unique policies, and he acknowledges that he was improving his position. Counsel, what's the relationship, if any, if you can state it, that is if the record shows it, otherwise don't volunteer, but between the amount of coverage on the disability policies given by Northwestern to Dr. Cook and whatever his coverage was on the prior policies? It's not in the record, Your Honor. There was something that I didn't find, but my law clerk did. I asked that question, and I don't know where she got it, but there's a $6,500 number and a $9,000 number, so she didn't talk to anybody. Is it in the record in that fashion? There's information in the record about the amounts of coverage that he was obtaining through Northwestern Mutual. There's no comparison of those amounts to his past coverage. It just says that it was an improvement in his prior coverage. Okay, thank you. So I think the distinction is the record at summary judgment, essentially all that was before the court was admissions by Dr. Cook that he had made false statements, and he admitted this during Northwestern Mutual's investigation. He admitted this during his deposition, and he admitted it at trial as well, that he made false statements in a number of the questions that were asked, in particular his recent treatment by a psychiatrist and a psychologist. That was Dr. Swinehart, who we had just seen at the clinic on those 22 occasions, and also medical testing. He just had five. So what was it that the jury got then that caused them to find that he didn't intentionally mislead? Well, one of the big distinctions that counsel drew at trial was that there were very different applications that were filled out by Dr. Cook. So that was a big point. Now, today, during argument— Is this the practitioner issue? Right, there's a difference in language which was focused on and emphasized substantially in the course of the litigation, that the 94 policy didn't say specifically— it didn't call out whether you'd seen a psychiatrist. It just said a physician or a medical practitioner, and that that wasn't specific enough to trigger in Dr. Cook the notion that he should list all of that treatment that he'd been receiving. Did Northwestern argue to the jury that the oral history infected the 94 policies as well? Well, we weren't allowed to tell the jury that there'd been any finding of fraud. I understand that. I'm asking, did you argue to the jury that the misrepresentations in the oral history were a reason for rescinding the 94 agreement? I believe the PHI was mentioned to the jury. There was evidence of what was in all the prior documents. We couldn't say what that meant, though, and our difficulty was that left us potentially with the impression for the jury that there'd been a finding or somehow had been established that there was no problems with those prior applications. We couldn't tell the jury that those had been rescinded with those prior questions. We could just point out that there'd been prior questions asked, and that was it, which left the jury to guess, what is the import of all of that? I don't think anybody could rightly tell. The main focus at trial was on the 94 policy and the application that Dr. Cook filled out. One of the things that we did produce testimony on was that this application process builds on each other. It's kind of like you're building a house. You start in the beginning with Dr. Cook's 92 application, and he acknowledges those were false statements in that document. They're not allegedly false. Dr. Cook says multiple times they were false statements. The dispute is whether he had an intent to deceive, and we argued, well, there's a presumption of intent to deceive. There's multiple Washington cases, the Keeson-Camm case, which we cite the court to, Cutter and Buck, and there's a number of others, where they look at circumstantial evidence, and is anything pushing back on that? On the record that the district court had, we had established that there was knowledge of false statements. Dr. Cook acknowledged in his deposition he knew exactly why they were asking the questions. He knew they were assessing risk. He was a medical trained professional himself. He had just gone through this intense course of treatment, one of the most significant things probably in his life, and that ended unsuccessfully, and then he tried to obtain his own occupation coverage. So there's no doubt, I think, on that record that he knew that those questions were answered falsely. Northwestern Mutual then, in underwriting, takes into account that earlier PHI and that earlier application, and because of that there's a less, essentially less detailed process that you get in 94, and thus the distinction in the 94 time period, there wasn't a PHI because they already had one, and if it was in the last two years, they could rely on the previous PHI. You didn't have to go through the process again. They could also rely on his last declaration to medical examiners. So when he went into 92, he talked to a doctor. The doctor then asked him these questions on the form. He then signs it saying it's all true and accurate. That form was in 92 because of the high amount that he was seeking to obtain. In 94, he's just adding, and they already have that in the record, so he doesn't have to go to a medical examiner again. So that's another distinction in the time frame. The other issue is Dr. Cook, on summary judgment, on the business overhead expense policy, conceded to Northwestern Mutual's motion for summary judgment. That motion was for the fraud-based rescission of that business overhead expense policy. There's two that he took out in 1992. Same application, same declaration to medical examiner, same PHI. They're all for both policies. He concedes to our motion for summary judgment on that policy. That, like I said, was for... He doesn't concede to the merits of your claims, just that he doesn't get the policy. I thought that it was a sort of, at least as I understood the explanation, was a financial... Well, that's what Dr. Cook... Agree with your characterizations, isn't that correct? The point we made in our briefs in response, Your Honor, was that if you concede, yes, we do have to give you all your policy premiums and interest back. That's the only way you can get it, is if it's a fraud-based rescission. Otherwise, as we all know, insurance doesn't work such that if you don't need the benefit at the end, you can just ask for your premiums back. I mean, I'm sure we all wish that's how it worked, but there wouldn't be insurance companies either. So that's the implications of that decision. We laid that out in the briefs. Dr. Cook nonetheless demanded that check back. Demanded it. We sent it to him. He cashed the check. At that point, you have law of the case, and I think you have also judicial estoppel. You can't take one position, benefit from it over here, and then try and escape the legal implications of that same decision on the other side. Are you saying that he would not be entitled to get that check back on that 92 policy if he wasn't agreeing that there had been fraud? Correct, Your Honor. The only way that premiums plus interest get returned is based on a fraud-based rescission. At that point, there's an obligation for Northwestern Mutual to send that back with interest because there's no contract. Contract's torn up. So, of course, we don't get to keep the premiums either. It's like the contract never existed in the first place. Briefly, on attorney's fees, there were multiple issues there with, and I think I just briefly mentioned that the standard of view there should be abuse of discretion as to the factual determinations by the district court. Legal conclusions would be, of course, de novo. The district court did make factual determinations. It determined that Dr. Cook had unclean hands when he came to the court. That's a factual assessment. District court had heard all the testimony, had handled litigation throughout, had seen all the briefing. And the court determined Dr. Cook came to the court with unclean hands in that application process. Also determined that Dr. Cook was not the prevailing party. As we've laid out in the briefs, this also wasn't a coverage case. This was a case about whether there was a contract to begin with. Northwestern Mutual began paying Dr. Cook on the coverage. They weren't disputing coverage. It's when all of these issues became uncovered, despite Dr. Cook's uncooperative attempts to conceal them in the course of Northwestern Mutual's investigation, that the fraud-based rescission was taken forward. But that's not a coverage dispute. That's whether was there a contract in the first place. I think that's different under Washington law, and I see my time is done, Your Honors. Thank you. You have about a minute and a half. Thank you. All the arguments made by Northwestern Below and the ones you're hearing today are legitimate arguments, but they are jury arguments. They're factual arguments. They are arguments that should not have been taken from the jury by the judge. In the Houston v. New York Life decision from 1932 Washington Supreme Court that we cite in our brief, insured does not have to disclose each and every time he has consulted a physician, and it was a question of fact for the jury to determine whether the particular ailment was a serious disease and whether or not the applicant so considered it when he answered the questions relating to physicians in the application. Dr. Cook testified in a deposition and a trial. He did not think his bouts with sadness or what a lay person would call depression was a serious disease. After his treatment with Dr. Swinehart he thought he didn't have it because none of the antidepressants alleviated his symptoms. In his mind he didn't have a diagnosed problem with depression, and therefore it would be a question for the jury whether or not by failing to list Dr. Swinehart, whether they proved by clear and convincing evidence that he intended to deceive the company. A few other issues. There were two policies preexisting. It is in the record at ER 72. There is an ADA policy of $4,000 a month and a Monarch policy of $2,500 a month. On the question of fees, it is the court's legal determination that these things matter, that we are appealing. There is a legal decision that unclean hands and prevailing parties somehow undercut the Olympic steamship rationale. There are many cases we cited in our brief that you can prevail on your breach of contract claim, not prevail on your bad faith or CPA claim, and still get attorney fees under Olympic steamship. It is different than a normal fee-shifting agreement that might be in a contract. The final point is we did in our notice of appeal claim that we were appealing the denial of the motion to reconsider. That is all the time I have. If the court has any questions, I would be happy to answer them. It appears not. Thank you. Thank both of you also for your patience being in the last case on the calendar today. Northwestern Mutual Life v. Cook is submitted.
judges: McKeown, Fisher, Gould